UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/26/2018

In re:

LEHMAN BROTHERS INC.,

344 INDIVIDUALS, Identified in the Notices of Appearance at Bankruptcy Court ECF Dkt. Nos. 8234, 8905 and 9459,

Appellants,

-against-

JAMES W. GIDDENS, as Trustee for the SIPA Liquidation of Lehman Brothers Inc.,

Appellee.

17 Civ. 6246 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Appellants, a group of creditors asserting claims against Lehman Brothers Inc. ("Debtor" or "LBI"), appeal from a decision of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). *Giddens v. 344 Individuals (In re Lehman Bros. Inc.)*, 574 B.R. 52 (Bankr. S.D.N.Y. 2017) (Chapman, J.). The Bankruptcy Court held on summary judgment that Appellants' claims are subordinated to the claims of Debtor's general unsecured creditors. *Id.* at 57. For the reasons stated below, the decision of the Bankruptcy Court is AFFIRMED.

**BACKGROUND**

The following facts are taken from the Bankruptcy Court's opinion and are undisputed. Appellants are former employees of Shearson Lehman Brothers Inc. ("Shearson") who entered into deferred compensation agreements with Shearson in the 1980s. *Id.* at 55; *see also* Agreement, ECF No. 13-18 at Ex. A (example agreement). Under each agreement, the employee agreed to defer portions of her compensation, and Shearson agreed to pay certain benefits upon her retirement.

*Giddens*, 574 B.R. at 55. Each agreement defines "Shearson" or "Employer" as "Shearson Lehman Brothers Inc., for itself and as agent for certain of its subsidiaries." *Id.*; *see also* Agreement at 1.

Each agreement contains two provisions stating that Shearson's obligations to pay benefits are unsecured, subordinated obligations. *Giddens*, 574 B.R. at 55. Section 5(d) states that "payments to be made by Shearson to Employee hereunder are unsecured subordinated obligations of Employer only, and Employee is only a general subordinated creditor of Shearson in that respect." *Id.* Section 9(d) states that

> Employee irrevocably agrees that the obligations of Shearson hereunder with respect to the payment of amounts credited to his deferred compensation account are and shall be subordinate in right of payment and subject to the prior payment or provision for payment in full of all claims of all other present and future creditors of Shearson whose claims are not similarly subordinated. . . . In the event of . . . liquidation pursuant to the Securities Investor Protection Act of 1970 . . . the Employee shall not be entitled to participate or share, ratably or otherwise, in the distribution of the assets of Shearson until all claims of all other present and future creditors of Shearson, whose claims are senior to claims arising under this agreement, have been fully satisfied or provision has been made therefor.

*Id.*

Section 9(a) of each agreement, which Appellants call the "right the ship" provision, suspends Shearson's payment obligations in the event that such payments would bring the company below certain capital requirements, and requires Shearson to take steps to ensure it could make payments without violating the requirements. Agreement § 9(a). Additionally, a number of provisions refer to an "Administrative Committee," which may terminate the agreements and pay the employees any withheld compensation. *See* Agreement §§ 2(a), 4, 5(a), (b), (f), (i). In a section titled "Binding Effect," each agreement states that it "shall be binding upon Employee and Employee's heirs and legal representatives and upon Shearson and Shearson's successors and assigns." *Giddens*, 574 B.R. at 55.

Between 1985 and 2008, Shearson underwent a series of corporate events, resulting in an entity named "Lehman Brothers Inc." *Id.* At the time the agreements were signed, Shearson was a subsidiary of American Express. *See* Appellants Mem. at 36, ECF No. 11. After merging with E.F. Hutton in 1988, Shearson changed its name to "Shearson Lehman Hutton Inc." *Giddens*, 574 B.R. at 58. In 1990, that entity sold those assets associated with E.F. Hutton and changed its name back to "Shearson Lehman Brothers Inc." *Id.* In 1993, Shearson sold its retail brokerage and asset management business to Primerica. *Id.* In 1994, the remainder of Shearson was spun-off from American Express into LBI. *Id.*; *see also* Appellants Mem. at 36. In 2008, LBI commenced a liquidation pursuant to the Securities Investor Protection Act ("SIPA"), and in May 2009, Appellants submitted claims for deferred compensation pursuant to the agreements. *Giddens*, 574 B.R. at 55. An adversary proceeding was commenced to determine whether Appellants' claims are subordinated to those of Debtor's general unsecured creditors. *Id.* at 56. Before discovery was conducted, Appellants Mem. at 3, both Appellants and the Trustee for the SIPA Liquidation of Lehman Brothers Inc. ("Appellee") filed motions for summary judgment. *Giddens*, 574 B.R. at 56.

The Bankruptcy Court granted Appellee's motion, holding that Appellants' claims are subordinated to the claims of Debtor's general unsecured creditors. *Id.* at 57. The Bankruptcy Court held as a matter of law that (a) the subordination provisions apply to successor entities to Shearson, and in any event, Shearson and LBI are the same entity; (b) even if LBI had breached the agreements, as Appellants argue, the subordination provisions would still apply; and (c) even if the agreements are "executory contracts" that Appellee rejected, as Appellants argue, the subordination provisions would still apply. *Id.*

**DISCUSSION**

I. Jurisdiction and Legal Standard

The Court has jurisdiction over appeals of final bankruptcy orders pursuant to 28 U.S.C. § 158(a). "A district court reviews an appeal of a Bankruptcy Court's grant of summary judgment *de novo*, drawing all factual inferences in favor of the non-moving party." *Spanish Broad. Sys., Inc. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, No. 16 Civ. 0487, 2016 WL 7377272, at *2 (S.D.N.Y. Dec. 13, 2016) (citation omitted).

II. Analysis

A. Choice of Law

The agreements do not contain choice-of-law clauses, but the parties and the Bankruptcy Court analyze them under New York law. A federal bankruptcy court confronting a state law contract claim that does not implicate federal policy applies the choice-of-law rules of the state in which it sits. *See In re Gaston & Snow*, 243 F.3d 599, 601 (2d Cir. 2001). In contract disputes, New York courts apply the law of the "center of gravity" of the contract. *See In re Liquidation of Midland Ins. Co.*, 947 N.E.2d 1174, 1178–79 (N.Y. 2011). Because Shearson was located in New York, the Court is satisfied that New York is the "center of gravity" of each contract and that New York law should apply.

B. Whether the Subordination Provisions Apply to Shearson Successors

Successors in interest to a corporation are generally entitled to enforce their predecessors' agreements. *See Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*, 572 F.3d 86, 90 (2d Cir. 2009).[1] Appellants argue, however, that in these contracts, the parties agreed

1 Although Appellants argue that successor entities are not *necessarily* entitled to enforce their predecessors' contracts, they cite only *Local 348-S v. Meridian Mgmt. Corp.*, 583 F.3d 65, 69 (2d Cir. 2009), which states that "under general principles of contract law a non-consenting successor would not normally be bound to the terms of a contract to which that party did not agree." But Debtor is not a non-consenting party to the agreements, and continued to make payments under them prior to its liquidation. Appellee Mem. at 23, ECF No. 13. In any event, the principle in *Local 348-S* is taken

otherwise: that the subordination provisions apply only in the event of Shearson's insolvency, not the insolvency of a successor to Shearson, Appellants Mem. at 21; and further, that for this purpose, "successor" has a special, agreed-upon meaning: an entity with a different "risk profile" than Shearson had in 1985 when the contracts were signed, *id.* at 35.

"[T]he objective of contract interpretation is to give effect to the expressed intentions of the parties." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985). Under New York law, "[w]here the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Id.* "However, where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment is improper." *Id.* (internal quotation marks, alterations, and citations omitted). Whether or not a contract is ambiguous is a question of law. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993). A court may not consider extrinsic evidence in determining whether or not a contract is ambiguous, but if a court finds ambiguity, then it may examine such evidence in order to determine the parties' intent. *W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

Appellants argue that the contracts unambiguously limit the subordination provisions from applying to a Shearson successor (using the special meaning of "successor" they offer), or in the alternative, that the contracts are at least ambiguous on this point. Appellants Mem. at 23, 29. Put another way, Appellants contend that the only reasonable way to read the contracts is that they contain this limitation, or that at a minimum, their interpretation is one of two reasonable ways to read the contract. Appellee argues, and the Bankruptcy Court agreed, that the only reasonable way to interpret the contracts is that they do not limit the subordination provisions from applying to

---

from *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550 (1964), in which the Supreme Court interpreted a contract that did *not* state that it was binding on a party's successors, and observed that "the general rule [is] that in the case of a merger the corporation which survives is liable for the debts and contracts of the one which disappears," *id.* at n.3.

Shearson's successors or contain any special definition of "successor." Appellee Mem. at 10. The Court agrees with the Bankruptcy Court.

In each contract, the employee "irrevocably agree[s]" that Shearson's obligations to her under the contract are subordinated. Agreement § 9(d). Each contract contains a provision stating that the contract would be "binding upon . . . Shearson and Shearson's successors and assigns." Agreement § 11. There is no statement in the contract which suggests that the subordination provisions do not bind Shearson successors.

In urging that their interpretation is reasonable, Appellants rest, in large part, on extrinsic evidence. For example, Appellants ask the Court to compare the agreements to "earlier, similar agreements" and draw conclusions about their differences, or to rely on an affidavit submitted by a former Shearson employee, an Appellant, who did not draft the agreements but who describes the underlying negotiations and his understanding of the agreements. Appellants Mem. at 23–24 & n.15. As discussed earlier, however, under New York law the Court may not look to extrinsic evidence to determine the meaning of an otherwise unambiguous agreement. *See W.W.W. Assocs.*, 566 N.E.2d at 642. Appellants urge the Court to disregard this principle because, in determining ambiguity, New York courts also "should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed." *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998) (citation omitted). However, the Court's consideration of "the minutiae of contract formation and negotiation which precipitated" the contract's execution would go "well beyond the type of 'circumstances' meant by the New York Court of Appeals in [*Kass*]." *Barclays Capital Inc. v. Giddens (In re Lehman Bros. Inc.)*, 478 B.R. 570, 591–92 (S.D.N.Y. 2012), *aff'd sub nom*. *Giddens v. SEC (In re Lehman Bros. Holdings Inc.)*, 761 F.3d 303 (2d Cir. 2014). The Court, therefore, shall not examine the extrinsic evidence adduced by Appellants.

Appellants also make two textual arguments. First, they point out that the subordination provisions (1) provide that the obligations "of Shearson" and "of Employer" are subordinated to claims of other creditors "of Shearson," and (2) do not mention successor entities to Shearson. Agreement §§ 5(d), 9(d). Appellants contrast this with two clawback provisions, which state that if Shearson's net capital drops below a certain amount, the employee shall "repay to Shearson, *its successors or assigns*, the sums so paid" to him. Agreement at 10, 13 (emphasis added). They argue that under the principle of *expressio unius est exclusio alterius*, the two references to "Shearson, its successors or assigns" mean that every other use of "Shearson" does not include its successors; and that under the canon against superfluity, Appellee's interpretation of the contract would render the two uses of "its successors or assigns" in the clawback provisions meaningless. Second, Appellants argue that § 11, the "Binding Effect" clause—which states that "[t]his agreement shall be binding upon Employee and Employee's heirs and legal representatives and upon Shearson and Shearson's successors and assigns"—causes only Shearson's burdens to pass to its successors, and not any benefits (*e.g.*, the subordination of employees' claims). They argue that if § 11 stated that the agreement "shall be binding *and inure to the benefit of* Shearson and Shearson's successors and assigns," the subordination provisions would apply, but in the absence of this language, it is only Shearson's burdens which are passed on to its successors. *See generally* Appellants Mem. at 22–29. Both arguments fail.

To start, the cases Appellants cite involve straightforward applications of the textual canons they seek to apply. For example, *Croteau v. A.C. & S. (In re N.Y.C. Asbestos Litig.)*, 838 N.Y.S.2d 76, 80 (1st Dep't 2007), concerns a textbook application of the *expressio unius* doctrine, in which the court held that where a contract required one party to indemnify the other except in a certain circumstance, the parties did not intend to create any other exceptions to indemnification. In *Taylor v. Cont'l Grp. Change in Control Severance Pay Plan*, 933 F.2d 1227, 1234–35 (3d Cir. 1991), the

court, applying New York law, found a term to be ambiguous that, if applied to an asset purchaser, would render an entire contract provision unnecessary. And in *Roberts v. Chesapeake Operating, Inc.*, 426 F. Supp. 2d 1203, 1208 (D. Kan. 2006), the court, applying Kansas law, found that where two separate entities are referenced *in the same sentence* and only one is followed by "or its successors," the parties intended to exclude the successors of the other from the provision. Here, however, "Shearson" is repeated over one hundred thirty times in each contract, Appellee Mem. at 18, and the phrase "its successors or assigns" appears only twice, in sections unrelated to the subordination provisions. This does not render the contracts ambiguous or support Appellants' proposed interpretation. *Cf. N.Y. Univ. v. Factory Mut. Ins. Co.*, No. 15 Civ. 8505, 2018 WL 1737745, at *11 (S.D.N.Y. Mar. 27, 2018) ("[C]onsistent with the general principle that interpretive tools need not be deployed when the contract is unambiguous, *expressio unius* should not be applied to create ambiguity where none would otherwise exist.").

Furthermore, the Court does not find Appellants' argument about the "Binding Effect" clause persuasive. Essentially, Appellants argue that because of the absence of the words "and inures to the benefit of" in the clause, the parties intended for each use of "Shearson" to include "and its successors" when it is used to discuss one of Shearson's *obligations*, but to exclude "and its successors" when it is used to discuss a *benefit* inuring to Shearson. It is not reasonable to conclude that the parties intended each of the over one hundred thirty uses of "Shearson" to have one of two meanings depending on whether it is used to discuss a benefit or a burden to Shearson, or that every use could even be categorized in this way. Nor do Appellants provide any authority for this argument. Appellee, however, cites a case which rejects it. *See Mehul's Inv. Corp. v. ABC Advisors, Inc.*, 130 F. Supp. 2d 700, 707–08 (D. Md. 2001).

Perhaps the argument that most undermines Appellants' proposed interpretation, which, as stated, incorporates a special definition of "successor" for the purposes of the subordination

provisions, is that Appellants propose one definition of "successor" in their opening brief and then shift to a different one in their reply. Put another way, Appellants offer inconsistent explanations as to what would cause Shearson to change such that the subordination provisions would no longer apply to it. In their opening brief, Appellants seem to argue that if Shearson ceased to be a subsidiary of American Express (which it was at the time the contracts were executed), then it would become the kind of "successor" that could no longer rely on the subordination provisions. *See* Appellants Mem. at 10 ("[B]ecause of Shearson's deep dependence on American Express for its capital support and regulatory compliance, removal of that support would have removed Shearson's financial ballast to the extent that any future, materially different, iteration of Shearson would be a gravely risky entity."); *see also id.* at 36 (arguing that the subordination provisions had been agreed upon because "a bankruptcy of Shearson was virtually inconceivable due to the fact that American Express was a lender to and stood behind the company in numerous material ways"); *id.* at 44 n.35 (referring to "the *sine qua non* significance of American Express'[s] ownership of Shearson and the indispensability, *at an absolute minimum*, of American Express still being in place for the subordination provision to apply" (emphasis added)). However, after Appellee pointed out in its opposition that the contracts do not contain a single reference to American Express, Appellee Mem. at 17, Appellants instead argued in their reply that the subordination provisions are merely "limited to the entity with the financial profile and substantive composition Shearson had in 1985"—*i.e.*, that the definition of "successor" is *not* necessarily tied to any relationship with American Express—and that therefore, "the lack of any express contractual reference to American Express . . . is, in fact, the most logical approach." Appellants Reply at 3 n.4, 7, ECF No. 16. However they define "successors," Appellants cannot be heard to claim that the drafters inserted it into the agreements "in a simple way." Appellants Mem. at 11. Ultimately, their irresolute stance weighs against their argument that their interpretation is reasonable.

The Court concludes, therefore, that Appellants' interpretation of the agreements is not reasonable, and that the agreements unambiguously do not contain such a limitation on the applicability of the subordination provisions (or any special meaning of "successor" for purposes of the subordination provisions). As Appellants acknowledge, if the agreements do not contain any special meaning of "successor," LBI is at least a successor to Shearson under the principles of general corporate law. Appellants Mem. at 42.[2] LBI is, therefore, entitled to enforce the agreements.

C. Whether a Breach of Contract Vitiates the Subordination Provisions

Appellants argue that Shearson breached the agreements by failing to maintain an administrative committee or to "right the ship," and that the breaches vitiate the subordination provisions. Appellants Mem. at 44–52. The Bankruptcy Court found as a matter of law that even if such breaches occurred, the subordination provisions would still apply. *Giddens*, 574 B.R. at 60–62. The Court agrees with the Bankruptcy Court.

Appellants argue that there is a "general rule" that a breach of contract vitiates a subordination provision that applies to the claims of the nonbreaching party, but again, fail to cite authority supporting their position. Appellants Mem. at 44–49. Their reliance on *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298 (D. Mass. 2010), a case interpreting Massachusetts law, is misplaced. The court in *Noonan* held that a breach of contract may prevent the breaching party from enforcing a provision in which the nonbreaching party agreed not to sue, but did not hold that any subordination provision in the contract should not apply. *Id.* at 340–41. Appellants also cite to *Alden State Bank v. Sunrise Builders, Inc.*, 853 N.Y.S.2d 230 (4th Dep't 2008). But in that case, the court found that a subordination provision *was* enforceable following a breach. *Id.* at 232. Moreover, as Appellees demonstrate, courts applying New York law frequently enforce contract

[2] Accordingly, the Court need not resolve the parties' dispute over whether Shearson and LBI are the same entity, or whether LBI is a successor to Shearson.

provisions that benefit a breaching party. For example, in *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 507 (N.Y. 1994), the New York Court of Appeals enforced a contract provision prohibiting the recovery of consequential damages by a nonbreaching party. Similarly, courts "routinely enforce forum-selection clauses against plaintiffs alleging breach of contract." *Beaubois v. Accolade Constr. Grp., Inc.*, No. 15 Civ. 5302, 2016 WL 94255, at *3 (S.D.N.Y. Jan. 7, 2016).

Appellants also argue that "any material breach of contract vitiates in all respects the contract burdens on the party whose rights were breached," Appellants Mem. at 46, but again, the cited cases do not stand for this proposition. For the most part, Appellants rely on cases which hold that in the event of one party's breach, the other party's *performance* is excused—*i.e.*, the nonbreaching party cannot be held liable for breach. *See, e.g.*, *Fitzgibbons Boiler Co. v. Nat'l City Bank of N.Y.*, 39 N.E.2d 897, 899–900 (N.Y. 1942) (stating that if the plaintiff had caused defendant to breach their contract, plaintiff could not insist upon defendant's "fulfillment" of the contract). However, Appellee does not seek to compel Appellants' performance, but rather to uphold a subordination provision which contemplates a SIPA liquidation like the one at issue here. Appellants also cite *United States, for Use of Susi Contracting Co. v. Zara Contracting Co.*, 146 F.2d 606, 610 (2d Cir. 1944), where the Second Circuit held that despite limitations on recovery in a contract, a nonbreaching subcontractor could sue for *quantum meruit* after breach by the general contractor, but the case did not concern a subordination provision.

Appellants also argue that notwithstanding the above principles, the subordination provisions should not apply here because these particular alleged breaches (*i.e.*, the failure to maintain an administrative committee or to "right the ship")—were breaches "of specific contract protections against subordination/insolvency risk." Appellants Mem. at 46. They argue, therefore, that "each breach forecloses the possibility of subordination." *Id.* at 45. The Court disagrees. Appellants cite

no supporting authority. Moreover, Appellants seek to establish a connection between the allegedly breached provisions and the subordination provisions, for the most part, by reference to extrinsic evidence. Appellants Mem. at 12–13 & nn.7–8, 15–17. As discussed, the Court will not consider extrinsic evidence where the contract is unambiguous. Finally, the allegedly breached provisions themselves contain no indication that they are linked to the subordination clauses. As Appellee argues, although the agreements contain provisions which reference an administrative committee—and at one point, state that the committee has the right (but not the obligation) to terminate the agreements, *see* Agreement § 4—the agreements do not obligate Shearson to create or maintain the committee, "much less to prefer the executives and select employees over all other claimants by ensuring that they were paid if the threat of a bankruptcy loomed." Appellee Mem. at 22. With respect to the "right the ship" provision, this clause states that, if making payments under the agreements would cause Shearson to fall below certain capital requirements, Shearson would (i) suspend payments to employees temporarily, (ii) take steps to ensure it was able to make the payments without falling below the requirements; and then (iii) pay the suspended amounts and continue making payments under the agreement. Agreement § 4. However, there is no indication in the agreements that the failure to take steps to meet the capital requirements would cause Appellants' "irrevocably" subordinated claims to become unsubordinated—and in any event, LBI continued to make payments under the agreements until its liquidation.

The Court holds that, assuming the contracts were breached, the subordination provisions would still apply as a matter of law.

D. Whether the Rejection of Executory Contracts Vitiates the Subordination Provisions

Finally, the Bankruptcy Court held that even if the agreements were "executory contracts" under the Bankruptcy Code, the subordination provisions would still apply. *Giddens*, 574 B.R. at 63. Pursuant to 11 U.S.C. § 365(a), a trustee may "assume or reject any executory contract . . . of the

debtor." A contract which is not assumed within sixty days is deemed rejected. *Id.* § 365(d)(1). Although the term "executory contract" is not defined in the statute, "most courts . . . [define it] as a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *In re Riodizio, Inc.*, 204 B.R. 417, 421 (Bankr. S.D.N.Y. 1997) (internal quotation marks and citation omitted). Rejection of an executory contract "constitutes a breach of [the] contract." 11 U.S.C. § 365(g). Appellants argue that the contracts are executory, that they were rejected, and that the rejection vitiated the subordination provisions. Appellants Mem. at 54–59. The Bankruptcy Court held as a matter of law that even if the agreements were rejected, executory contracts, the subordination provisions would still apply. *Giddens*, 574 B.R. at 63. The Court agrees.

Rejection "does not completely terminate the contract." *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386–87 (2d Cir. 1997). It does not "release, revoke, repudiate, void, avoid, or cancel . . . contract obligations." *Id.* (internal quotation marks and citation omitted). Instead, it "leaves the non-debtor in the same position as all others who have dealt with the debtor, by giving rise to a presumption that the debtor has 'breached.'" *Id.* at 387 (internal quotation marks and citation omitted); *see also O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*, 981 F.2d 1450, 1459 (5th Cir. 1993) (noting that rejection of an executory contract is merely a breach of the contract, and that it "does not invalidate the contract, or treat the contract as if it did not exist").

Appellants argue that by rejecting the agreements, but enforcing the subordination provisions, Appellee is "cherry-picking" the clauses which it rejects and enforces. Appellants Mem. at 55. This is incorrect. If the contracts are rejected, Appellants are entitled to bring an action for breach, and they may receive damages which, by the contract's terms, are subordinated in the event of a SIPA liquidation. *See O'Neill*, 981 F.2d at 1459 ("Contract rejection damages are based upon what an

employee would have made under the rejected contract."); *see also Cohen v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992) (noting that "[r]ejection merely frees the estate from the obligation to perform; it does not make the contract disappear" and that rejection "does not embody [] contract-vaporizing properties" (citation omitted)). Appellants argue, in effect, that when a debtor rejects an executory contract, only those provisions which favor the debtor disappear from the contract, but not the others. Appellants refer to this as a "bedrock rule," Appellants Reply at 32, but again, fail to cite any cases applying such a rule.

Additionally, Appellants cite 11 U.S.C. § 502(g), which states that damages for rejection of an executory contract are measured on a pre-petition basis, and argue that damages, therefore, should be measured as if the SIPA liquidation had not occurred at all. But notably, the agreements state that the obligations to pay Appellants "*are* unsecured subordinated obligations," that each Appellant "*is* only a general subordinated creditor of Shearson," and that in the event of a SIPA liquidation, each Appellant "shall not be entitled to participate or share . . . in the distribution of the assets of Shearson" until all senior claims are satisfied. Agreement §§ 5(d), 9(d) (emphasis added). Appellants' claims, therefore, were subordinated at the pre-petition stage. Moreover, if Appellants were correct that the rejection of an executory contract vitiates any subordination provisions it has, then as a logical extension of their argument, subordination provisions could *never* come into effect in an executory contract. This is because in the only alternative scenario—that the debtor assumes the contracts and abides by their terms—the debtor would not be in breach and the creditor's claim for damages would never arise. This conflicts with the Bankruptcy Code, which allows for the enforcement of subordination provisions. *See* 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.").

Therefore, assuming the agreements are, as Appellant argues, rejected, executory contracts, the Court holds that the subordination provisions still apply.

**CONCLUSION**

Accordingly, the decision of the Bankruptcy Court granting summary judgment for Appellee and denying summary judgment for Appellants is AFFIRMED. The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: September 26, 2018
New York, New York

ANALISA TORRES
United States District Judge